IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PENNSYLVANIA FEDERATION OF
SPORTSMEN'S CLUBS, *et al.*,

            Plaintiffs,

        v.

GALE A. NORTON, Secretary,
United States Department of the
Interior, *et al.*,

            Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil No.: 1:03-CV-2220

JUDGE SYLVIA H. RAMBO

**M E M O R A N D U M**

      Before the court are the Plaintiffs' Motion for Summary Judgment (Doc. 39) and Defendants' Joint Cross-Motion for Summary Judgment (Doc. 47).  The parties have briefed the issues and the matters are ripe for disposition.  For the following reasons, the court will deny Plaintiffs' motion and grant Defendants' motion.

**I.**       **Background**

     **A.**     **Introduction**

      This case involves questions concerning the Office of Surface Mining Reclamation and Enforcement's ("OSM") authority to perform various administrative actions under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA").[1]  Specifically, Plaintiffs challenge OSM's authority to approve state "program enhancements," terminate a program deficiency notice issued under

---

[1] SMCRA is codified at 30 U.S.C. §§ 1201-1328.

30 C.F.R. § 732.17 ("the Part 732 notice"), and delete a program amendment that was codified at 30 C.F.R § 938.16(h).  Each is described in greater detail below.

SMCRA establishes the minimum Federal requirements for regulating surface coal mining and reclamation efforts for the benefit of the environment and public welfare.  *See* 30 U.S.C. § 1201.  The Act established OSM "as a subdivision within the Department of the Interior with the Secretary of the Interior acting through the OSM, empowered to administer the various state programs for controlling surface coal mining pursuant to the Act."  *Pa. Fed. of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 315 (3d Cir. 2002) (citing 30 U.S.C. § 1211(a), (c)).  SMCRA intends for states to be the primary source of regulation of surface mining and reclamation activities in order to account for the "diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations."  30 U.S.C. § 1201.

State programs become permanent and states achieve primary jurisdiction, or "primacy," when the Secretary of the United States Department of the Interior ("the Secretary") approves a proposed state program or implementation of a Federal program in the state.  *See* 45 Fed. Reg. 69,970, 69,972 (Oct. 22, 1980).  "The federal regulations for the [state] program, including procedures for states to follow in submitting state programs and minimum standards and procedures the state programs must include to be eligible for approval, are found in 30 C.F.R. Parts 700 and 730-865."  *Id.*  The Secretary approved Pennsylvania's permanent program on July 30, 1982.  47 Fed. Reg. 33,050 (July 30, 1982) (to be codified at 30 C.F.R. pt. 938).

### B.    The Parties

The five Plaintiffs are: Pennsylvania Federation of Sportsmen's Clubs, Inc.; the Pennsylvania Chapter of the Sierra Club; Pennsylvania Trout, Inc.; Tri-State Citizens Mining Network, Inc.; and Mountain Watershed Association, Inc.  Plaintiffs are nonprofit membership organizations, corporations, and coalitions that focus on Pennsylvania's environment and conservation of natural resources.  Defendants are Gale A. Norton, sued in her official capacity as the Secretary of the United States Department of the Interior; Jeffrey D. Jarrett, sued in his official capacity as the Director of OSM; and Brent Wahlquist, sued in his official capacity as the Regional Director of OSM's Appalachian Regional Coordinating Center.  In addition, the Commonwealth of Pennsylvania, Department of Environmental Protection ("PADEP") was permitted to join as an Intervenor-Defendant.

### C.    Bonding Programs

Approval of a state program under SMCRA is contingent upon the state's establishment and maintenance of a bonding program that will support reclamation of surface mining areas if permitted operators should fail to do so. SMCRA requires that every operator must post a reclamation bond before the state may issue the operator a permit to begin mining operations.  30 U.S.C. § 1259(a). The two basic types of bonding programs include a conventional, or "full cost" system ("CBS") and an alternative bonding system ("ABS").  *See* 30 U.S.C. § 1259(a) (authorizing a CBS, a bond "sufficient to assure the completion of the reclamation plan if the work had to be performed by the regulatory authority in the event of forfeiture"), § 1259(c) (authorizing an ABS, "an alternative system that will achieve the objectives and purposes of the bonding program pursuant to this

3

section"). The implementing Federal regulations pertaining to the CBS and ABS are found at 30 C.F.R. §§ 800.11(a) through (d) and 30 C.F.R. § 800.11(e), respectively.

Pennsylvania's program, as approved, provided for the option to implement either a CBS or an ABS. The Pennsylvania Surface Mining Conservation and Reclamation Act ("PA SMCRA"[2]) states in relevant part that:

> The amount of the bond required shall be in an amount determined by the department based upon the total estimated cost to the Commonwealth of completing the approved reclamation plan, or in such other amount and form as may be established by the department pursuant to regulations for an alternate coal bonding program which shall achieve the objectives and purposes of the bonding program.

52 Pa. Cons. Stat. Ann. § 1396.4. The Secretary approved the bonding portion of PA SMCRA without condition. *See* 47 Fed. Reg. at 33,079-80 (setting forth "§ 938.11 Conditions of state regulatory program approval.").[3] Prior to and after attaining primacy, Pennsylvania operated an ABS to regulate surface mining activities.[4] The ABS drew upon the Surface Mining Conservation and Reclamation Fund ("the Fund") to supplement reclamation guarantees provided through site-specific bonds set below the cost of reclamation. The Fund's primary source of revenue was a one-

---

[2] PA SMCRA is codified at 52 Pa. Cons. Stat. Ann. §§ 1396.1 *et seq.*

[3] The Secretary indicated in Finding 18 that, although the Pennsylvania program met the minimum bonding requirements of SMCRA, there was some concern "about the continuing adequacy of the amount of the bond and permit fee required for permit areas that is applied to bond forfeitures in Pennsylvania." 47 Fed. Reg. at 33,056. The Secretary then stated that Pennsylvania would be required to submit the results of its annual study of the bonding amount to OSM "to facilitate oversight of this matter." *Id.* However, this caveat was not included as a condition of approval, and does not implicate the approved bonding program language providing for the option of a CBS or an ABS.

[4] The ABS covered surface coal mines, coal refuse reprocessing operations, and coal preparation plants. Coal refuse disposal operations and underground coal mines have always been covered under a CBS.

time, nonrefundable per-acre reclamation fee.  The fee was originally $50 per acre, but in 1993 Pennsylvania amended its regulations and raised to the fee to $100 per acre.  25 Pa. Code § 86.17(e); *see* 58 Fed. Reg. 36,139, 36,141 (July 6, 1993).

### D.    The Program Amendment at 30 C.F.R. § 938.16(h)

On May 31, 1991, OSM approved a program amendment ("the 1991 rulemaking"), codified at 30 C.F.R. § 938.16(h), that required Pennsylvania to either "submit information, sufficient to demonstrate that the [ABS] can be operated in a manner that will meet the requirements of 30 C.F.R. 800.11(e)," or to amend its rules or otherwise amend its program by November 1, 1991, to be compliant with Federal standards.  56 Fed. Reg. 24,687, 24,719-21 (May 31, 1991).  This action, known as a codified required amendment, was published in the Federal Register on May 31, 1991 as a Final Rule, following public notice as a Proposed Rule in the February 26, 1990 Federal Register and a period of public comment.

OSM subsequently removed the required amendment by publishing a Final Rule in the October 7, 2003 Federal Register.  *See* 68 Fed. Reg. 57,805 (Oct. 7, 2003).  OSM had announced its proposed removal of the required amendment in the June 26, 2003 Federal Register, *see* 68 Fed. Reg. 37,987 (June 26, 2003), and provided for a public comment period.  OSM stated that PADEP had responded to the deficiencies identified in the 1991 rulemaking by submitting a document entitled, "Pennsylvania Bonding System Program Enhancements" ("the program enhancements document").[5]  68 Fed. Reg. at 57, 805-06.  The program enhancements

---

[5]  PADEP included the program enhancements document with a June 5, 2003 letter responding to the Part 732 notice from OSM, which is discussed in greater detail below.  However, PADEP submitted to OSM in a second letter, also dated June 5, 2003, that the program enhancements document also resolved the issues necessitating the 1991 rulemaking's required program amendment.  In
(continued...)

document, which had been jointly prepared by OSM and PADEP, described the actions taken and planned by PADEP to ensure that Pennsylvania's bonding program would meet Federal standards. *Id.*

During the comment phase of the 1991 rulemaking process, OSM sought public comment for the limited purpose of "whether OSM should consider the [program enhancements document] sufficient to satisfy the required amendment at 30 C.F.R. § 938.16(h)." *Id.* Plaintiffs submitted comments during the public comment period.[6] Although the 1991 rulemaking included discussion of Plaintiffs' comments on whether the program enhancements document was sufficient to address the deficiencies in the ABS, OSM maintained that such comments were outside the scope of the rulemaking. *Id.*[7]

---

[5](...continued)
addition, the program enhancements document included an "Alternate Bonding System Primacy Discharge Abatement Workplan" ("the Workplan") that described PADEP's plan to prioritize treatment of discharges from state coal mines.

[6] All five of the instant Plaintiffs are referred to collectively as PennFuture in the 1991 rulemaking.

[7] Although OSM believed such comments were outside the scope of the rulemaking, OSM addressed comments on whether the program enhancements document sufficiently resolved the ABS deficiencies because it believed that the June 26, 2003 Federal Register proposed rule notice "may not have presented the scope of the proposed action upon which comment was invited with optimal clarity." 68 Fed. Reg. at 57,807.

### E.    <u>The Part 732 Notice</u>

A Part 732[8] notice "is a document in which [OSM] notifies the State that its regulatory program must be amended to be in accordance with SMCRA and consistent with the Federal regulations . . . . Such notification may be necessary as a result of Federal regulation changes, State or Federal court decisions, or problems identified during oversight or other program review processes."  U.S. Department of the Interior Office of Surface Mining Reclamation and Enforcement Directive System, "Processing of Proposed State Regulatory Programs and State/Tribal Abandoned Mine Land Reclamation Plans; and Part 732 and 884 Notification," STP-1, at 3, July 31, 2000.  Under some circumstances, but not all, a Final Rule published in the Federal Register may be considered a Part 732 notice.  *See id.*  Likewise, not all Part 732 notices must be Federal Register documents.  *Cf. id.*

On October 1, 1991, OSM sent the Part 732 notice to Pennsylvania, stating that the State's ABS "was no longer in conformance with Federal requirements and mandating that Pennsylvania propose amendments or descriptions of amendments to address the identified deficiencies. Thus the 1991 [Part 732 notice] addressed the same issue covered by the 1991 rulemaking."  68 Fed. Reg. at 57,806.

On June 5, 2003, PADEP responded to the Part 732 notice by submitting the program enhancements document.  OSM subsequently determined that the program enhancements document sufficiently addressed the deficiencies identified in the ABS program and, on June 13, 2003, Brent Wahlquist sent a letter to PADEP terminating the Part 732 notice.  On July 25, 2003, Plaintiffs sent a 40-page

---

[8]   30 C.F.R. Part 732 sets forth the procedural requirements for submission, review, and approval of state programs (§§ 732.11-.16), as well as for submission and approval of program amendments (§ 732.17).

letter to Mr. Wahlquist objecting to the decision to terminate the Part 732 notice.[9] On October 3, 2003, Mr. Wahlquist denied Plaintiffs' request that he rescind the termination of the Part 732 notice.

### F. __Procedural History__[10]

Plaintiffs filed a three-count complaint on December 8, 2003, alleging that Defendants violated provisions of the Administrative Procedure Act ("APA") when they: 1) approved the program enhancements document without processing it as a program amendment subject to public notice and comment; 2) approved the program enhancements document and terminated the Part 732 notice; and 3) promulgated the Final Rule that deleted the required program amendment codified at 30 C.F.R. § 938.16(h).

Plaintiffs filed their Motion for Summary Judgment on March 4, 2005. Defendants filed their opposition to Plaintiffs' Motion for Summary Judgment and Joint Cross-Motion for Summary Judgment on June 3, 2005. The court has jurisdiction to review agency action and actions constituting rulemaking by the Secretary pursuant to 5 U.S.C. § 702 and 30 U.S.C. § 1276(a).

---

[9] Plaintiffs' July 25, 2003 letter also included comments regarding the proposed termination of the required program amendment at 30 C.F.R. § 938.16(h); those comments were addressed in the 1991 rulemaking process as discussed above.

[10] Plaintiffs filed a related citizens suit complaint on October 3, 1999 before this court, docketed as *Pennsylvania Federation of Sportsmen's Clubs, Inc., et al. v. Kathleen A. McGinty, et al.*, Civil Action No.: 1:99-CV-1791. In that action, which is stayed pending disposition of this matter, Plaintiffs seek to compel Federal and State officials to comply with various provisions of SMCRA and related Federal regulations.

II.        **Legal Standard**

    A.        **Summary Judgment**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 249. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23.

" 'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.' " *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

The standards governing the court's consideration of Federal Rule 56(c) cross-motions are the same as those governing motions for summary judgment, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. *Raymond Proffitt Found. v. U.S. Envtl. Prot. Agency*, 930 F. Supp. 1088, 1096 (E.D. Pa. 1996).

## B.   Judicial Review of Agency Action

"A court's review of a regulation interpreting a statute is normally subject to *Chevron* deference," which requires a two-part inquiry. *Zheng v. Gonzales*, 422 F.3d 98, 112 (3d Cir. 2005). The court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In assessing whether an agency's interpretation is permissible, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11.

10

Rather, where Congress has delegated to an agency the authority to make rules and regulations necessary to fill gaps in a statute, the agency's "regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." 5 U.S.C. § 706(2)(A); *Chevron*, 467 U.S. at 844; *see also* 30 U.S.C. § 1276(a)(1) (SMCRA provides that "[a]ny action subject to judicial review under this subsection shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law"). Considerable deference should be given to an agency's interpretation of the statute it administers. *Id.* Thus, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Finally, this standard of review applies equally to an agency's decisions to pass a rule or to rescind a rule. *Id.* at 42-43.

## III.      Discussion

### A.      The Program Enhancements Document

In Count One of the complaint Plaintiffs argue that OSM's approval of the program enhancements document should have been processed as a program amendment, subject to public notice and comment requirements. Defendants argue that OSM's decision to approve the program enhancements document without conducting the program amendment process was a proper exercise of the agency's discretion.

## 1. **Reviewability**

The threshold issue is whether OSM's approval of the program enhancements document constituted a reviewable agency action. Judicial review provisions of the APA apply, "according to the provisions thereof, except to the extent that – (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a); *see Heckler v. Chaney*, 470 U.S. 821, 828 (1985) ("before any review at all may be had, a party must first clear the hurdle of § 701(a)"). Section (a)(2) means that when there is "no meaningful standard against which to judge the agency's exercise of discretion," review of agency action is precluded. *Heckler*, 470 U.S. at 831.

Defendants have not identified, nor has the court found, any statutory provisions that would preclude the court's review here. Accordingly, the court must determine whether there are any meaningful standards that the court can apply to the agency's action. *Id.* Both the APA and SMCRA contain provisions that will aid the court in determining whether OSM's approval of the program enhancements document constituted conduct subject to public notice and comment requirements. Thus, the court will proceed with its review, guided by those provisions.

## 2. **Required Procedure**

The court will first consider whether and what procedure is mandated by SMCRA. Section 732.17 of SMCRA sets forth the procedural requirements and substantive bases for State program amendments.[11] It identifies, "at a minimum"

---

[11] The text of 30 C.F.R. § 732.17 has been amended several times; however all of the amendments except one occurred prior to the filing of this action. On October 20, 2005, OSM published a Final Rule modifying paragraphs (f)(2), (h)(1), (h)(2), (h)(8), (h)(12), and (h)(13). *See* 70 Fed. Reg. 61,194, 61,206 (Oct. 20, 2005). Thus, the 2005 amendments do not implicate the specific regulations

(continued...)

seven situations in which States must notify the Director "of any significant events or proposed changes which affect the implementation or enforcement of the approved State program." *See* 30 C.F.R. § 732.17(b).[12]  The scenario that is most relevant is that involving "[c]hanges in the State law and regulations from those contained in the approved State program," *id.* § 732.17(b)(3); however, the program enhancements document does not modify the statutory language of PA SMCRA.  Thus, § 732.17(b)(3) is inapplicable here.

Other provisions of SMCRA are instructive though.  30 C.F.R. §§ 932.17(c) and (d) establish the procedure for first determining, then notifying, the State regarding whether a program amendment is required.  Section 932.17(c) states that "the Director shall determine whether a State program amendment is required," an explicit statement of Congress's intent to impart to the Director the discretion to make that decision.  Moreover, § 732.17(e) provides in relevant part that "State

_____

[11](...continued)
the court relies upon in this portion of the opinion.

[12]  30 C.F.R. § 732.17(b), in its entirety, provides:
The State regulatory authority shall promptly notify the Director, in writing, of any significant events or proposed changes which affect the implementation, administration, or enforcement of the approved State program.  At a minimum, notification shall be required for –
(1) Changes in the provisions, scope or objectives of the State program;
(2) Changes in the authority of the regulatory authority to implement, administer or enforce the approved program;
(3) Changes in the State law and regulations from those contained in the approved State program;
(4) Significant changes in staffing and resources of the regulatory authority and divisions or departments of other agencies with duties in the approved program;
(5) Changes in agreements between the regulatory authority and other agencies which have duties in the approved program;
(6) Significant changes in funding or budgeting relative to the approved program; and
(7) Significant changes in the number or size of coal exploration or surface coal mining and reclamation operations in the State.

program amendments *may* be required when – (2) Conditions or events change the implementation, administration or enforcement of the State program." *Id.* § 732(e)(2) (emphasis added).  Upon consideration of these SMCRA provisions, the court cannot conclude that the program enhancements document mandates a State program amendment even if the program enhancements described therein result in "conditions or events [that] change the implementation, administration or enforcement of the State program." *Id.*

The court will therefore consider whether OSM's approval of the program enhancements document constituted rulemaking "without observance of procedure required by law," under the APA.  5 U.S.C. § 706(2)(D).  The APA's public notice and comment requirements for rulemaking[13] are set forth in 5 U.S.C. § 553.  However, 5 U.S.C. § 553 exempts the following from its procedural requirements:

> Except when notice or hearing is required by statute, this subsection does not apply –
> (A) to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice;
> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefore in the rules issued) that notice and public procedure thereon are

---

[13]  The APA defines rulemaking as "the agency process for formulating, amending, or repealing a rule."  5 U.S.C. § 551(5).  The APA defines rule as

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services, or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4).

> impracticable, unnecessary, or contrary to the public
> interest.

5 U.S.C. § 553(b).  Interpretive rules are "types of agency action that describe what the agency believes the statute and existing regulations require but that do not alter" or contradict those requirements.  *Shalala v. Guernsey Mem'l Hosp.* 514 U.S. 87, 111 (1995).  General statements of policy are " 'statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.' " *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).

Plaintiffs maintain that notice and comment procedures are required because the program enhancements document implements mechanisms that are not part of Pennsylvania's approved program.  Specifically, Plaintiffs argue that four aspects of the program enhancements document constitute *de facto* amendments: 1) bifurcated reclamation bonds; 2) conversion assistance guarantees; 3) trust funds; and 4) reclamation priorities.  Defendants argue that all four elements fall within the existing CBS.  In addition, Defendants aver that the program enhancements document simply summarizes actions already taken or planned, which OSM approved separately or would approve through a separate process.  Defendants argue that, therefore, consideration of OSM's "approval" of the program enhancements document is misplaced because Plaintiffs' proper recourse is to challenge the individual actions via the appropriate State and Federal mechanisms.

Upon consideration of the administrative record, the court concludes that neither PADEP nor OSM viewed the program enhancements document as a separate action in need of OSM's approval.  OSM Regional Director Bruce Wahlquist's June 12, 2003 letter to PADEP Secretary Kathleen A. McGinty

acknowledges the program enhancements document as a joint effort between the agencies and refers to the document as a description of enhancements that address issues pertaining to the Part 732 notice.  (AR at 153.)  The two June 5, 2003 letters from PADEP to OSM likewise refer to the document only in terms of how it satisfies obligations under the Part 732 notice and required amendment, but offer no indication that the document itself requires independent approval.  (*Id.* at 155-60.)

The program enhancements document itself is framed as "A discussion and analysis of bond program enhancements and changes *undertaken*." (*Id.* at 161.) (program enhancements document subtitle) (emphasis added)  Further, the program enhancements document largely describes actions that have already been taken by PADEP and OSM, such as conversion from the ABS to the CBS, implementation of a revised CBS that utilized bifurcated reclamation bonds, use of legislative appropriations to address the bond forfeiture site deficit and water treatment requirements, and preparation of a bond forfeiture inventory.  (*See* AR at 165-75.) The document also includes descriptions of plans to address additional issues such as use of the State's allocation of funds for forfeiture sites, abatement of bond forfeiture discharges, bonding program enhancement reporting, and specifics of OSM review regarding various aspects of the State program.  (*Id.*)

In sum, although the program enhancements document is a summary of various actions taken and planned by PADEP and OSM, the document does nothing to actually implement any of those actions, many of which had already occurred when the document was submitted.  To put it another way, the program enhancements document and related correspondence merely interpret various actions and how they address issues and obligations identified by OSM in the Part 732

16

notice and required amendment, but in no way independently alter or contradict existing program requirements.  *See Shalala.* 514 U.S. at 111.  Thus, the program enhancements document falls squarely within the "interpretive rules" exception of 5 U.S.C. § 553 and is not subject to the APA's public notice and comment requirements.

Moreover, the court agrees with Defendants that Plaintiffs' arguments regarding the bifurcated reclamation bonds, conversion assistance guarantees, trust funds, and reclamation priorities are beyond the scope of the relief Plaintiffs seek in Count One.  The court will not construe the question of appropriate procedure required in connection with the program enhancements document as a catchall basis for examining whether appropriate procedure was followed with respect to four separate actions undertaken by OSM and PADEP, or whether such actions otherwise comply with the APA or SMCRA.[14]  If Plaintiffs wish to challenge such actions, they must do so through the appropriate means available under State and Federal law.  Accordingly, the court will grant summary judgment in favor of the Defendants as to Count One.[15]

---

[14]  The court will consider the arguments regarding the various aspects of actions discussed in the program enhancements document as appropriate within the context of the remaining counts.

[15]  Plaintiffs also make an argument that the OSM should have approved the program enhancements document through public notice and comment procedures because OSM communicated to PADEP on multiple occasions prior to June 2003 that a program amendment was the optimum means of addressing issues identified in the Part 732 notice.  Such an argument, however, has no bearing on the court's reasoning with respect to Count One but is more relevant to the remaining counts.  The court will address it accordingly.

**B.**     **The Part 732 Notice and the Oct. 7, 2003 Final Rule**

In Count Two of the complaint Plaintiffs challenge OSM's approval of the program enhancements document and related termination of the October 1, 1991 Part 732 notice as "arbitrary, capricious, or otherwise not in accordance with law" pursuant to 5 U.S.C. § 706(2)(A). The court has already determined that the program enhancements document was not an independent action involving an "approval" by OSM. Therefore, with respect to Count Two, the court will only consider the program enhancements document insofar as it assists in the court's review of the Part 732 notice termination.

Plaintiffs allege in Count Three of the complaint that OSM's Final Rule published at 68 Fed. Reg. 57,805 (Oct. 7, 2003) was "arbitrary, capricious, or otherwise inconsistent with law" in violation of 30 U.S.C. § 1276(a)(1). Defendants argue that the OSM reasonably explained in the Final Rule that it removed the required amendment at 30 C.F.R. § 938.16(h) because of PADEP's decision to convert to a CBS.

Because both the Part 732 notice and required amendment identified deficiencies in the ABS, OSM's termination rationales are essentially the same. Accordingly, the court will consider Counts Two and Three together.

**1.  Reviewability – The Final Rule**

Again, the threshold inquiry is reviewability. SMCRA expressly provides for judicial review of "[a]ny action by the Secretary promulgating national rules or regulations." 30 U.S.C. § 1276(a)(1). Therefore, the court may review OSM's Final Rule deleting the required amendment at 30 C.F.R. § 938.16(h). The

18

court must affirm the Final Rule unless the court finds it to be "arbitrary, capricious, or otherwise inconsistent with law." *Id.*

## 2. Reviewability – The Part 732 Notice

The court must also determine whether OSM's termination of the Part 732 notice is reviewable. Defendants argue that OSM's termination of the notice was an exercise of agency discretion that is not subject to judicial review. Defendants also argue that, to the extent the court agrees with Plaintiffs' position that the Part 732 notice should be construed as a program amendment, Plaintiffs' challenge is untimely.[16]

The relevant question is whether the Part 732 notice termination falls within the scope of the APA's judicial review provisions or whether it falls within the narrow category of actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a); *Heckler,* 470 U.S. at 828. As discussed above, where actions are committed to agency discretion, there is a presumption of unreviewability. *Mahoney v. U.S. Prods. Safety Comm'n*, 146 Fed. Appx. 587, 589 (3d Cir. 2005). The presumption, however, can be overcome "where the 'substantive statute has provided guidelines for the agency to follow in exercising enforcement powers.' " *Id.* (quoting *Heckler*, 470 U.S. at 833.) The Third Circuit has also looked to an agency's "self-imposed practices or regulations" as a basis for review. *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 343 F.3d 199, 206 (3d Cir. 2003).

---

[16] Defendants' timeliness argument is misplaced. The sixty day statute of limitations of 30 U.S.C. § 1276 applies to the approval or disapproval of State programs, "promulgation of national rules or regulations," and "other actions constituting rulemaking." However, in each case, the statute of limitations applies to the *Secretary's* actions. *Id.* The issuance and termination of the Part 732 notice were actions taken by *Regional Director* Wahlquist. Thus, the statute of limitations does not apply to those actions.

The Third Circuit has developed an analytical framework for determining whether an agency action is committed to agency discretion. The court must consider whether:

> 1) the action involves broad discretion, not just the limited discretion inherent in every agency action;
> 2) the action is a product of political, military, economic, or managerial choices not readily subject to judicial review; and
> 3) the action does not involve charges that the agency lacked jurisdiction, that the decision was motivated by impermissible influences such as bribery or fraud, or that the decision violates a constitutional, statutory, or regulatory command.

*Id.* at 205. (discussing *Local 2855, AFGE (AFL-CIO) v. United States*, 602 F.2d 574 (3d Cir. 1979)).

Plaintiffs assert that OSM's regulations, specifically 30 C.F.R. §§ 732.17(f)(1), (2) and 733.12, as well as the statutes and regulations that govern approval and modification of State programs, provide manageable standards for reviewing OSM's termination of the Part 732 notice. Plaintiffs also maintain that the *Heckler* exception is inapplicable here because the instant case involves review of an agency oversight proceeding and the decision to terminate it, but not an agency's choice not to exercise enforcement discretion. *See Heckler*, 470 U.S. at 823. Defendants counter that the State program amendment provisions of 30 C.F.R. § 732.17 provide no meaningful standards for judicial review of either the issuance or termination of Part 732 notices.

Defendants also argue that because SMCRA's judicial review provisions, specifically 30 U.S.C. § 1276(a)(1), restrict the availability of judicial review to those who participate in "administrative proceeding[s]," and because the regulations at 30 C.F.R. § 732.17 do not mandate or expressly provide for such

20

proceedings, agency actions with respect to Part 732 notices that are not processed as program amendments are not reviewable.  However, the APA contains judicial review provisions, which do not restrict the court's review of agency action in this manner, that apply here.  *See* 5 U.S.C. § 701 (judicial review provisions apply unless statute precludes review or commits agency action to agency discretion); § 706 (judicial review includes "determin[ing] the meaning or applicability of the terms of an agency action").  In addition, SMCRA's reference to judicial review in one category of proceeding is not sufficiently specific to constitute clear and convincing evidence of Congressional intent to preclude review.  *See Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967).  Thus, the question of whether judicial review is permissible turns only on whether there are manageable standards.

Although the regulations at 30 C.F.R. § 732.17 afford the Director some discretion in determining whether rulemaking proceedings are required, they offer clear guidance for the procedure that must be followed once the Director takes the step of issuing a Part 732 notice.  The language of § 732.17(f) that was in effect when Plaintiffs commenced this action explicitly sets the time frame in which a state must respond to a notice (60 days) and states that, if a state fails to respond in the manner the regulations require within that time frame, "the Director *must* begin proceedings under 30 C.F.R. part 733."[17]  30 C.F.R. § 732.17(f)(2) (emphasis added).

---

[17]  Before 2005, the regulations afforded the Director no discretion in making the decision to commence Part 733 proceedings.  *See* 70 Fed. Reg. 61,194, 61,194-96, 61,199 (Oct. 20, 2005) (changing the mandatory requirement of § 732(f)(2) to a discretionary decision that OSM believed would more accurately reflect an approach that was better suited to resolving typical State program problems and to be more consistent with § 733.12).  The statutory provisions and regulations do not provide for retroactive application; thus, the court is bound by the language that existed at the time the action was filed.  *Altoona Hosp. v. Thompson*, 131 Fed. Appx. 355, 357 n.3 (3d Cir. 2005) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law.  Thus,

(continued...)

Thus, although the language of § 732.17 affords discretion regarding whether to issue a notice in the first place, its instructions regarding when to commence part 733 proceedings once a notice has been issued might seem to provide manageable standards for judicial review of OSM's decision not to advance to that stage.

However, interpreting the statute so narrowly would fail to address the real issue that is before the court.  Neither § 732.17 nor Part 733 specifically provide for the termination of Part 732 notices.  More importantly, the question regarding OSM's termination of the Part 732 notice is not so easily resolved by simply acknowledging the clear directive of 30 C.F.R. § 732.17(f)(1) to commence part 733 proceedings, even combined with the undisputed fact that OSM did not do so.  Once OSM begins enforcement proceedings under § 733.12, aside from adhering to the requirement to notify the State, the Director is afforded discretion whether to take any further steps.  *See* 30 C.F.R. §§ 733.12(b), (c), (d).  Section 733.12(d) provides: "*If* an informal conference is not held . . . or *if* the Director *still has reason to believe* that the State is failing to adequately implement, administer, maintain, or enforce a part or all of a State program, the Director *shall* [proceed with the requirements of this section.]"  Thus, the mandate to proceed under part 733 is qualified by the Director's discretionary assessment of the circumstances at that point.  Part 733's provisions therefore permit OSM, at least in some circumstances, to terminate enforcement proceedings in a way that is essentially equivalent to the termination of the Part 732 notice that is presently before the court.

---

[17](...continued)
congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.")).  Accordingly, the court must apply the pre-2005 version of 30 C.F.R. § 732.17(f)(2).

Finally, even though 30 C.F.R. § 733.12(d) affords the Director discretion in determining whether to continue with additional part 733 proceedings, it provides standards that are sufficiently manageable for judicial review.  The court can consider the factors of whether "the State is failing to adequately implement, administer, maintain or enforce a part or all of" its program, in conjunction with SMCRA's provisions and regulations.  Accordingly, the court will proceed with the *Chevron* inquiry within this context.

### 3.  The *Chevron* Inquiry

It is clear that Congress has not spoken on either of the precise questions before the court.  *See Chevron,* 467 U.S. at 842.  Neither SMCRA nor its regulations provide specific instruction regarding when and whether OSM may terminate a Part 732 notice or delete a required program amendment.  Therefore, the court must proceed to the second step of the *Chevron* inquiry – whether OSM's termination of the Part 732 notice or approval of the Final Rule deleting the required amendment or both were based on a permissible construction of SMCRA.  *See id.* at 843.

Plaintiffs argue that OSM's termination of the Part 732 notice was "patently arbitrary and capricious" because Regional Director Wahlquist failed to sufficiently set forth the rationale for the action in his June 12, 2003 letter to PADEP.  Defendants counter that the program enhancements document, which Mr. Wahlquist referenced, contains a rationale that satisfies the arbitrary and capricious standard.  Mr. Wahlquist stated in the June 12, 2003 letter that "he concur[red] that the actions taken by PADEP, as described in Mr. Pizarchik's June 5, 2003 letter and attachment" were sufficient to address the deficiencies identified in the Part 732 notice.  (AR at

23

153.)  Mr. Wahlquist's letter also indicates that the decision to terminate the Part 732 notice was made after consideration of the actions taken over the years – actions that were described in the program enhancements document.  (*Id.*)  The court disagrees that such statements and references to the program enhancements document so fundamentally fail to articulate a rationale as to be "patently arbitrary and capricious."  Instead, the court must consider whether the explanations and descriptions contained in the program enhancements document provide a sufficient basis for OSM's decision to terminate the Part 732 notice.

The program enhancements document also forms the crux of Plaintiffs' challenge to the approval of the Final Rule.  OSM also relied upon the program enhancements document in justifying its deletion of the required program amendment.  Thus, the court's review must consider whether the document was sufficient for that purpose as well.

### a.  The Program Enhancements Document

As discussed previously, the program enhancements document provides descriptions of various aspects of Pennsylvania's bonding program, including summaries of actions taken and plans for future actions.  First, the program enhancements document discusses Pennsylvania's conversion of its bond program from an ABS to CBS for surface mines, coal refuse reprocessing, and coal preparation plants.  (AR at 166.)  Pennsylvania's program, as approved, provided for the option of implementing either.  *See* 52 Pa. Cons. Stat. Ann. § 1396.4.  Likewise, SMCRA's regulations provide for either option.  *See* 30 C.F.R. § 800.11.  Accordingly, the court cannot conclude that the decision to implement a CBS and

subsequently convert from an ABS as needed, is based upon an impermissible interpretation of the statutes or regulations.

Next, the program enhancements document discusses revisions and proposed revisions to the CBS, including the bifurcation of land and discharge treatment reclamation bonds.  SMCRA contains no preclusion of bifurcated bonds, but simply establishes minimum requirements for bond coverage.  *See* 30 U.S.C. § 1259 ("the bond shall be sufficient to assure the completion of the reclamation plan").  Complete reclamation includes water treatment.  *W.Va. Mining and Reclamation Ass'n v. Babbitt*, 970 F. Supp. 506, 517 (S.D. W. Va. 1997) (citing *Cat Run Coal Co. v. Babbitt*, 932 F. Supp. 772, 781 n.17 (S.D. W. Va. 1996)).  Similarly, PA SMCRA does not preclude a bifurcated bond but simply specifies how a bond should calculated.  *See* 52 Pa. Cons. Stat. Ann. § 1396.4.; 25 Pa. Code § 86.149.  Therefore, the court cannot conclude that the implementation of bifurcated reclamation bonds is based upon an impermissible interpretation of the statutes or regulations.

The program enhancements document's acknowledgment that Pennsylvania planned to modify its regulations to include a mandatory bond adjustment provision (AR at 166) does not alter this finding.  The administrative record contains evidence that PADEP informally proposed the modification in a March 7, 2001 letter (AR at 242), stated its plan to begin the formal proposed amendment process during the summer of 2003 (AR at 167, 169), and subsequently began such proceedings (AR at 5).  SMCRA's enforcement provisions provide that states may respond to Part 732 notices either with an amendment or plan, including a schedule, for implementing, an amendment.  *See* 30 C.F.R. 732.17(f)(1).  Similarly,

25

the court finds it permissible to allow a state to present such a plan outside of the formal amendment process.

Further, the program enhancements document contains detailed descriptions of how both kinds of bonds will be calculated and enforced; the descriptions are rife with references to the statutory authority for these aspects of the program.  (AR at 166-68, 176-213.)  Again, the court cannot say that the interpretations expressed in the program enhancements document are based upon impermissible interpretations of the cited statutes and regulations, including the portions that discuss the roles of consent orders and agreements[18] and trust funds, which are provided for within the context of the State's general enforcement[19] authority.  *See* 52 Pa. Cons. Stat. Ann. § 1396.4(d.2)[20] (suggesting that PADEP may,

_____

[18]  The court agrees with Defendants that this finding is consistent with the court's ruling in *Pennsylvania PIRG, Inc. v. P.H.Glatfelter Co.* that consent orders may not be used as a means to circumvent statutory requirements.  128 F. Supp. 2d 747 (M.D. Pa. 2001).  The court has not found that Defendants have utilized consent orders and agreements in such a manner.  Accordingly, the courts prior decision does not preclude consent orders and agreements here.

[19]  The court notes that Plaintiffs devote a substantial portion of their brief to challenging use of trust funds as a part of the bonding program.  This argument is misplaced because it fails to address the program enhancements document's proposed use of trust funds on a case-by-case basis as an enforcement mechanism.  Moreover, Plaintiffs focus their arguments in large part on OSM's reference to its Termination of Jurisdiction Rule preamble language, *See* 53 Fed. Reg. 44,356, 44,362 (Nov. 2, 1988), but do not adequately address the specific statutory provisions that are also set forth in the program enhancements document and its trust fund related appendices.  Plaintiffs also provide lengthy interpretations of various bond release provisions, but fail to show that the Defendants' proposed use of trust funds as a means of enforcement authorizes bond release in a manner contrary to what SMCRA and its regulations allow.

[20]  52 Pa. Cons. Stat. Ann. §§ 1396.4(d.2) provides that

The department may establish alternative financial assurance mechanisms which shall achieve the objectives and purposes of the bonding program.  These mechanisms may include . . . the establishment of a site-specific trust fund funded by the operator for the treatment of post-mining discharges of mine drainage.  Within one hundred eighty (180) days after the effective date of this

(continued...)

at least in some circumstances, establish a trust fund for the treatment of post-mining discharges of mine drainage); § 1396.4c ("The department may issue such orders as are necessary to aid in the enforcement of the provisions of this act.  Such orders shall include, but shall not be limited to orders modifying, suspending or revoking permits . . . ."); 25 Pa. Code § 86.158(f) (providing the requirements for a collateral bond in the form of a trust fund).[21]

The program enhancements document also provided a detailed discussion of the status of permits throughout the bond conversion process, as well as a description of how PADEP utilized a $7 million general legislative appropriation to provide bond conversion assistance.  The program enhancements document does not indicate that the structure, obligations, or enforcement of Pennsylvania's program changed because of the appropriation.  *See* 30 C.F.R. § 732.17(e) (indicating when program amendment *may* be required) (emphasis added). Likewise, the $5.5 million General Assembly appropriation did not alter any aspect of the approved program.  In addition, Pennsylvania's approved program does not appear to prohibit the use of money obtained through appropriations, but simply

---

[20](...continued)
act, the department shall recommend to the Governor alternative financing mechanisms for the perpetual treatment of post-mining discharges of mine drainage.  This provision shall in no way affect the department's review of permit applications under existing law which prohibits the department from issuing a mining permit unless the applicant demonstrates that there is no presumptive evidence of potential pollution of the waters of this Commonwealth.

[21] The court notes that it also reviewed 52 Pa. Cons. Stat. Ann. §§ 1396.4(d), which was amended in May 13, 2005 to reflect the addition of language specifically allowing trust funds as an accepted form of bond.  The court's decision is not based on the amended language, which was not in effect when the instant action was filed, but in part on the fact that the language simply reflects acceptable forms of bonds at the initial permitting stage.  Therefore, it does not necessarily preclude use of trust funds as an enforcement mechanism.

regulates how moneys deposited in the Fund are used.  *See* 25 Pa. Code. § 86.187

("(a) Moneys received from fees, fines, penalties, bond forfeitures and other monies

received under authority of [PA SMCRA] . . . will be deposited in the Fund" and

"(a)(3) Other moneys deposited in the Fund may be used to reclaim land affected by

surface mining operations and for other conservation purposes consistent with the

purposes of the Fund, . . . .")  Under these circumstances, particularly where

SMCRA's program amendment regulations afford OSM some discretion in

determining when an amendment is required, the court cannot say that OSM's

interpretation of the statute or regulations was arbitrary or capricious.

The program enhancements document concludes with a description of

PADEP's approach to inventory and abatement of discharges on forfeited ABS sites,

including the 17-page Workplan, included as Appendix 5 of the document, which

sets forth the approach in detail. (AR at 218-34.)  It indicates that PADEP intends to

address ABS discharges through a watershed approach that considers the discharges

within the context of fundamental resources.  (*Id.* at 223-24.)  In other words,

PADEP will consider site priority as a factor along with programmatic resources,

Commonwealth watershed management objectives, and public involvement.  (*Id.* at

226.)  The Workplan proposes a schedule for proceeding with these efforts.  (*Id.* at

227.)  The court agrees with Defendants that this approach is not necessarily

inconsistent with Pennsylvania's "primacy first" rule.  *See* 25 Pa. Code § 86.189(a)

("The Department will first provide for the reclamation of bond forfeiture sites where

permits were issued under the [approved program]").  It appears that the approach is

driven by primacy status, but contemplates simultaneous treatment of non-primacy

sites where it is the more logical and effective way to achieve the overall goals of

SMCRA; the court cannot say that this is an impermissible interpretation of the statute and regulations.

Finally, the court will address Plaintiffs' argument that, because the Part 732 notice specifically identified deficiencies in the ABS, OSM abused its discretion in terminating the notice without requiring Defendants to demonstrate that the ABS was solvent. Although, the Part 732 notice identified the ABS as the specific reason for the notice, the court does not interpret the flexible language found in 30 C.F.R. § 733.12 as a requirement that a deficiency notice may only be resolved with one particular solution, or even through the course of action that OSM may suggest in the notice. Rather, the enforcement provisions appear to afford OSM the discretion to re-examine a State program on the whole to determine whether additional enforcement actions are necessary. Thus, the court does not find that PADEP's alternative approach automatically precludes a finding that OSM operated within its enforcement discretion with respect to the Part 732 notice termination.

### b. **Obligation under 30 C.F.R. 800.11(e)**

Plaintiffs maintain that the court should interpret SMCRA's ABS provisions to mean that a State may never dissolve an ABS without first making it solvent. SMCRA provides, in relevant part, that "[t]he [ABS] must assure that the regulatory authority will have available sufficient money to complete the reclamation plan for any area which may be in default *at any time*." Plaintiffs rely on this language in conjunction with OSM's rejection of proposed amendments in Missouri and West Virginia. Those states sought to amend their ABS's prospectively without ensuring sufficient funding to complete reclamation of sites previously forfeited. Defendants distinguish Pennsylvania's decision to terminate the ABS and fully

29

convert to use of the CBS from the efforts of Missouri and West Virginia to fix or

correct but continue to rely upon their ABS's.

Plaintiffs further argue their position by relying upon OSM's

explanation of its rejection of Missouri's proposed amendment:

> Reclamation liability under a bond pool must be continuous.  The liability and obligation of an ABS does not disappear if the bond pool finds itself unable to meet its obligations as they mature, or its existing capital structure is impaired or its ability to perform any of its obligations is impaired.  Additionally, existing liabilities of an impaired pool cannot be erased simply because proposed modifications to the pool will assure partial satisfaction of existing reclamation liabilities.  Stated differently, if a bond pool comes up short of cash, the regulatory authority cannot and should not be able to simply "write off" any existing reclamation liabilities and then resume business as usual by proposed modifications to the previous ABS.  This would be directly in conflict with the language of 30 C.F.R. § 800.11(e) and the purposes and objectives of section 509 of SMCRA, which provide that an ABS must have available sufficient money to complete reclamation for any areas which may be in default at any time.

59 Fed. Reg. at 21,286 (date).  Plaintiffs attempt to bolster their argument by

pointing to instances in the record where OSM espoused the same view.  (*e.g.* AR at

1310.)

First, the court notes that an agency's change of opinion does not

mandate a finding of arbitrary and capricious action.  "Where an agency has sharply

changed its substantive policy, then, judicial review of its action, while deferential,

will involve a scrutiny of the reasons given by the agency for the change." *Natural

Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 760 (3d Cir. 1982).  The court further

notes that, even with respect to rules and policies, agencies are not bound to

"establish rules of conduct to last forever," but "must be given ample latitude to

adapt their rules and policies to the demands of changing circumstances." *State

*Farm*, 463 U.S. at 42.  Changes to rules are simply subject to the same *Chevron* deference standard as the promulgation of the rules; so long as the agency supplies reasoned analysis that is supported by the record, its action must be upheld.  *Id.* at 42-43; *Chevron*, 467 U.S. at 843.

The portions of the record cited by Plaintiffs appear to be primarily draft documents; the court cannot discern whether or when and under what circumstances OSM may have conveyed this position.  Further, the Missouri rule rejection language speaks of "proposed modifications to the pool" and "resum[ing] business as usual by proposed modifications to the previous ABS" – language that supports an interpretation that OSM's decision was made in the context of Missouri's choice to continue operating an ABS.  The language of SMCRA itself does not address dissolution of an ABS one way or the other.  Section 800.11(e) simply provides for the option to implement an ABS, but is silent regarding termination of an ABS.

In addition, the court finds OSM's consideration of the potential impact of a Federal takeover persuasive.  OSM explained that "it is appropriate to require replacement of [insufficient ABS] bond coverage with a conventional bond posted under 30 C.F.R. 800.11(a) through (d).  That is what OSM would do if we were to institute a Federal bonding program in Pennsylvania or any other State with an ABS."  68 Fed. Reg. 57,805, 57,810 (Oct. 7, 2003) (*also at* AR at 6).  The court understands OSM's explanation to mean that where, as here, a State determines it is unable to correct the ABS insolvency, the options are either for OSM to take over the program, terminate the ABS in its current state, and implement a CBS, or continue to allow the State to manage the program and let the State implement an approach equivalent to what OSM would adopt.  OSM's interpretation is thus consistent with

the obligation that a State program conform to minimum Federal standards. Interpreting the statute in a manner that maintains Pennsylvania's program as it would be if under Federal management (and thus in conformance with Federal standards) but managed by the State, is also consistent with SMCRA objectives.  *See* 30 U.S.C. § 1201(f) ("the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States").

In sum, the fact that the interpretation that Plaintiffs advance may be a permissible one does not mean that OSM's interpretation cannot also be permissible, which is the inquiry that the court is required to make.  *Chevron,* 467 U.S. at 843. Upon consideration of 30 C.F.R. § 800.11(e), the different context in which OSM previously interpreted that language, and the rationale OSM set forth in its Oct. 7, 2003 Final Rule, the court is satisfied that OSM has interpreted SMCRA's bond requirements in a permissible manner.  Accordingly, the court finds that the decision to allow PADEP to convert from an ABS to a CBS without first requiring Pennsylvania to make the ABS solvent was not arbitrary and capricious.

### c.  The Workplan

Plaintiffs challenge the Workplan on the grounds that it fails to satisfy obligations imposed by 30 C.F.R. § 800.11(e).  Defendants respond that once Pennsylvania converted from the ABS to the CBS, the obligations of § 800.11(e) became inapplicable to the State's bonding program.[22]  Defendants argue, therefore, that Pennsylvania's "programmatic responsibility" to assure that the ABS had

---

[22]  The Federal bonding requirements for a CBS are set forth at 30 U.S.C. § 1259(a) and 30 C.F.R. §§ 800.11(a) through (d).

sufficient funds to cover sites forfeited under the ABS ended once the bond program converted to the CBS.  The court agrees that a conversion to the CBS amounts to a conversion of applicable statutory provisions and regulations.  Accordingly, any ongoing obligations arising from 30 C.F.R. § 800.11(e) cease to apply.

The court has also considered the Workplan-related explanations provided by OSM in its Final Rule as part of the rationale for why the agency determined that the required amendment was no longer necessary.  OSM explained that the Workplan's outline for how various funding resources would be used to address existing deficiencies in the ABS, along with all of the State program efforts summarized in the program enhancements document, discussed above, supported its decision that the proposed conversion rendered further compliance with 30 C.F.R. § 800.11(e) moot.  Plaintiffs attack the Workplan on grounds that it fails to set forth a reviewable time frame.  However, the Workplan discusses the schedule for water treatment in the context of total maximum pollutant loadings (TMDLs), wherein it sets forth a detailed plan and schedule.  (*See* AR at 224-227.)  The fact that the plan recognizes that additional scheduling will need to be determined after initial scheduled phases are complete (AR at 227) does not give the court sufficient cause to find the entire plan irrational.  Moreover, the Workplan, like the program enhancements document, expressly builds in OSM oversight and review throughout, which will enable OSM to take future action if it determines that any parts of the plan do not work as anticipated.  Therefore, the court does not find the Workplan, or OSM's reliance upon it, to be an insufficient statement of OSM's reasons for its decision to delete the required amendment or terminate the Part 732 notice.

Upon consideration of the foregoing discussion, the court finds that OSM's October 7, 2003 Final Rule and its decision to to terminate the Part 732 notice, which was effectively a decision not to proceed with enforcement under 30 C.F.R. part 733, were proper means of exercising the agency's discretion and authority.  OSM's assessment of Pennsylvania's program at that point, along with the description of additional actions planned by PADEP, as set forth in the program enhancements document, was based on permissible interpretations of the law. Accordingly, OSM's decisions to terminate the Part 732 notice and delete the required program amendment at 30 C.F.R. 938.16(h) were not arbitrary, capricious, or otherwise not in accordance with law.  The court will grant summary judgment in favor of the Defendants as to Counts Two and Three.

**IV.**        <u>**Conclusion**</u>

For the foregoing reasons, the court will deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Joint Cross-Motion for Summary Judgment.  An appropriate order will issue.

<u>s/Sylvia H. Rambo</u>
SYLVIA H. RAMBO
United States District Judge

Dated:  February 1, 2006.

34

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PENNSYLVANIA FEDERATION OF
SPORTSMEN'S CLUBS, *et al.*,

Plaintiffs,

v.

GALE A. NORTON, Secretary,
United States Department of the
Interior, *et al.*,

Defendants.

Civil No.: 1:03-CV-2220

JUDGE SYLVIA H. RAMBO

# O R D E R

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT**:

1) Plaintiffs' Motion for Summary Judgment (Doc. 39) is **DENIED**;

2) Defendants' Joint Cross-Motion for Summary Judgment (Doc. 47) is **GRANTED**; and

3) The clerk of court is directed to enter Judgment in favor of Defendants and against Plaintiffs and close the file.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  February 1, 2006.